OLIVER V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO.  2-05-144-CR

PHILON OLIVER APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

A jury convicted Appellant Philon Oliver of kidnaping and sexually assaulting T.J., a disabled adult woman.  The jury assessed punishment at a total of sixty years’ confinement, and the trial court rendered judgment accordingly.  In two points, Appellant argues that the evidence was factually insufficient to support the verdict.  We affirm.

Background

Appellant was employed as a driver by a contractor for the Fort Worth Transportation Authority’s Mobility Impaired Transportation Service (“MITS”).  MITS provides transportation services to disabled passengers.  Appellant drove a car, as opposed to a bus or a van, in the course of his duties as a MITS driver. 

Helen White, the director of Heritage Adult Day Care, testified that the complainant, T.J., had attended her facility for about two years.  White testified that T.J. had suffered several strokes that left her physically impaired, unable to speak in phrases longer than one or two words, and unable to defend herself. MITS provided door-to-door transportation for Heritage clients, including T.J., and Appellant was one of T.J.’s drivers. 

John Green, the director of human resources, risk management, and security for the Fort Worth Transportation Authority, testified that MITS received a complaint from T.J.’s mother stating that Appellant had taken T.J. to his apartment and had sex with her.  Green testified that he interviewed Appellant and identified T.J. as the complainant but did not tell Appellant the nature of the complaint.  Green said that Appellant asked, “Are you here to arrest me?”  Appellant told Green that he had never taken T.J. to his apartment but then said he had taken her there one time.  Appellant also said that he regularly picked T.J. up early, drove her to his apartment, and left her in the car while he made coffee in the apartment—all in violation of MITS rules.  Appellant told Green that T.J. had entered his apartment to use the toilet on one occasion and was in the apartment for about three minutes.  Green testified that all MITS vehicles are equipped with a GPS tracking system that monitors the vehicle’s location, speed, and route. 

Janice Pearce, an MITS supervisor, testified that she was responsible for monitoring MITS vehicles through the GPS tracking system.  Through Pearce, the State offered a printout of the GPS log from Appellant’s vehicle for the day of the alleged assault.  According to the log, Appellant picked up T.J. at her residence at 8:14 a.m., forty-six minutes earlier than scheduled.  The log shows that Appellant then drove directly past Heritage Day Care to a location near his apartment, arriving there at 8:42.  His car remained parked at that location until sometime between 8:54 and 9:39, when the GPS system recorded his vehicle at another location.  Pearce testified that MITS records show that Appellant phoned his employer and reported that he had picked up T.J. at her residence at 9:36. 

Vivian Williams testified that she lived with Appellant at the time of the alleged assault.  Williams said that she relies on MITS to travel to and from work because she has extremely poor eyesight.  She met Appellant when he was her MITS driver.  When Appellant returned home from his interview with John Green, he told Williams that an MITS rider had made a sexual-contact complaint against him.  Appellant told Williams that he picked up T.J. and then returned to the apartment to make a cup of coffee and let T.J. use the restroom.  Appellant told Williams that T.J. touched his “private parts” as they were leaving the apartment.  Williams testified that seven days before the alleged assault, she noticed that the pillows and other items on the bed in her guest bedroom had been moved.  She asked Appellant about it, and he said that he had cleaned up the room for her, which struck Williams as odd because Appellant had never cleaned up for her before.  On the day of the alleged assault, Williams again noticed that one of the pillows was askew on the bed.  A few days later, Appellant laundered the bedclothes from the guest bedroom, which struck Williams as odd because it was only time she ever saw him wash laundry.  Williams also said that on the day of the alleged assault she called Appellant on his cell phone between 9:00 and 9:15 a.m.; Appellant told her “I’m glad you called because I overslept.” 

Dr. Jeffery Chase, an emergency room physician, testified that he examined T.J. in the emergency room eight days after the alleged assault for a health problem unrelated to the assault.  T.J.’s mother told him that T.J. had been sexually abused.  As part of his treatment, Dr. Chase conducted a pelvic exam on T.J.  He saw no indication that T.J. had been sexually abused such as bruises, tears, or lacerations, but he testified that it would be very extraordinary to see such indications on a sexual-abuse victim. 

The State then called T.J. to testify.  T.J.’s testimony consists almost entirely of one-word answers, mostly “yeah” and “no,” to questions posed by the State’s and Appellant’s counsel and is at times confused and contradictory.  She successfully named the colors of pens shown to her by the State’s counsel and identified various parts of anatomically-correct male and female dolls.  She also identified Appellant.  T.J. testified that Appellant took her to his apartment three times.  She said she did not want to go there and that Appellant did not ask her if she wanted to go there.  She identified photographs of Appellant’s apartment as the place where he took her.  T.J. testified that Appellant took her clothes off and touched her vagina with his penis and that his penis went inside her vagina.  She said that the assault occurred on a bed and identified the bed in a photograph of the guest room in Appellant’s apartment.  She also identified the bedspread that was on the bed at the time—the same bedspread Williams said Appellant later washed. 

Appellant testified in his own defense.  He said that he often picked up T.J. early because “sometimes we have so many people booked up.”  He testified that the GPS tracking device was often inaccurate.  Appellant said that after he picked up T.J. on the morning of the alleged assault, he drove past the day care center because T.J. said she wanted to ride with him to pick up the next passenger, whom Appellant was supposed to pick up at 10:00.  Appellant testified that he stopped at his apartment to get coffee even thought he knew it was against MITS policy to do so.  He said that he left T.J. in his car while he went into his apartment.  Appellant testified that he went back out to the car to check on T.J. after five minutes and she told him that she needed to use the bathroom.  Appellant said that he let her use his bathroom, even thought that was against MITS policy, so that she would not have an accident in his car.  According to Appellant, he took T.J. into his apartment and into the bathroom and shut the bathroom door.  He said that while she was in the bathroom, he went to the kitchen to get something to eat.  Appellant testified that when he checked on T.J. a few minutes later,  he found her sitting on the bed of the guest bedroom.  He said that T.J. asked him to tie the drawstring on her pants.  Appellant said that he pulled her pants up, tied the drawstring, and helped T.J. out to his car.

Appellant testified that he first learned about the sexual-assault allegation when his employer’s dispatcher told him to come to the office because T.J. had complained that Appellant had taken her to his apartment to have sex.  He said that John Green, contrary to Green’s testimony, also told him that the complaint was sexual in nature.  He testified that he washed the guest-room bedspread because he got shoe polish on it; he also said that he did laundry all the time and did not know why Williams said that he did not.  He denied that he ever had any type of sexual contact with T.J.  He testified that T.J. was “very attracted” to him, as were many of his MITS passengers. 

On cross-examination, Appellant said that various parts of John Green’s, Janice Pearce’s, Vivian Williams’s, and T.J.’s testimony were lies.  He testified that T.J. could speak in complete sentences and that Helen White lied when she said that T.J. could only speak in one- or two-word phrases.  He explained that White lied because she had been romantically attracted to him in the past. 

Standard of Review

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.  
See Zuniga v. State
, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt.  
Id
. at 484.  In performing a factual sufficiency review, we are to give deference to the fact finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Id.
 at 481; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the fact finder’s.  
Zuniga, 
144 S.W.3d at 482.

Discussion

Appellant argues that the evidence is factually insufficient to support the jury’s verdicts because T.J.’s “various physical ailments and disabilities have left her so mentally impoverished that her testimony is unreliable as a matter of law[.]”  To support his argument, Appellant points to those portions of T.J.’s testimony where T.J. seemed particularly confused or contradicted herself.  For instance, when asked by the prosecutor how often she rode with Appellant to pick up another passenger, T.J. answered, “Day care.”  When asked whether she knew what the word “sex” means, she shook her head “no.”

Appellant did not challenge T.J.’s mental capacity to testify at trial, and the trial court permitted her to testify after the State briefly questioned T.J. outside the presence of the jury.  
See
 
Tex. R. Evid.
 
601(a)(1) (providing that a witness is not competent to testify if the trial court determines that the witness is insane).  “[T]he concept of truthfulness properly includes mental capacity as well as moral disposition.”  
Schutz v. State,
 957 S.W.2d 52, 68 (Tex. Crim. App. 1997).  To the extent that T.J.’s mental capacity could be a factor in assessing her truthfulness and credibility, we defer to the jury.  
See Zuniga
, 144 S.W.3d at 481.

Considering all of the evidence in a neutral light, and deferring to the jury on the questions of T.J.’s credibility and demeanor, we hold that the jury was rationally justified in finding guilt beyond a reasonable doubt.  We therefore overrule Appellant’s two issues and affirm the trial court’s judgment.

ANNE GARDNER

JUSTICE

PANEL F: CAYCE, C.J.; GARDNER and MCCOY, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:  May 25, 2006

FOOTNOTES
1:
See 
Tex. R. App. P. 
47.4.